# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Kenneth O'Neal,

      Plaintiff,

      v.

Erik K. Shinseki, Secretary,
U.S. Department of Veterans Affairs

      Defendant.

Case No. 13 C 653

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff Kenneth O'Neal brought this suit against Defendant Erik Shinseki, the Secretary of the U.S. Department of Veterans Affairs (the "VA"). Plaintiff alleges that, in terminating his employment, the Defendant discriminated against him on the basis of sex in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-16, and on the basis of age in violation of the Age Discrimination in Employment Act ("ADEA"). 9 U.S.C. § 621 *et seq.* Defendant filed a Motion for Summary Judgment [22]. For the following reasons, that Motion is GRANTED.

## I.    Background

### A. Plaintiff's Employment with the VA

Plaintiff is a 63 year old man who was licensed as a registered nurse ("RN") in 1979. [29] at 2; [24-5] D. Ex. 3 at 9. He was hired by the VA as a RN on September 22, 2008. [30-1] P. Ex. 1. At the time, he was 57 years old. He was hired to work at the Edward Hines Jr. VA Hospital and assigned to the Mental

Health Service at 2 South. [30-1] P. Ex. 1. His position was considered a temporary excepted appointment under 38 U.S.C. § 7405(a)(1)(A). *Id*. In that position, Plaintiff was subject to a short "temporary" period before beginning a two year probationary period. PSOF ¶3.

Upon beginning his employment, Plaintiff underwent a two week hospital orientation and a four week unit orientation. PSOF ¶4. He signed a form acknowledging that he completed his unit orientation, [24-6] D. Ex. 4, and admitted that he had reviewed and understood the VA policies regarding patient care in his unit. [24-9] D. Ex. 7 at RFA 9. Theodora Banks ("Banks"), a Clinical Nurse Manager, was Plaintiff's immediate supervisor. Alton Alexander ("Alexander") was the Associate Chief Nurse, and Plaintiff's second-line supervisor. PSOF ¶ 2.

**B. The Patient Care Incident**

This matter concerns the Plaintiff's improper response to a patient request for medication (the "incident").[1] On November 7, 2008, Patient X was transferred to the Mental Health Service because he was having suicidal ideation. DSOF ¶ 7; [24-3] D. Ex. 2 (EEO Hearing) at 45:3-8. The Patient had just undergone back surgery and was receiving pain medication through an IV immediately prior to his transfer to 2 South. [24-3] D. Ex. 2 at 187:13-17. On 2 South, the medical staff could not continue administering medication in intravenous form for safety reasons, and the medical director said that the Patient was concerned about how his pain was going to be managed. *Id*. at 187:3-17. Plaintiff admitted Patient X to 2 South around 5:00 p.m. on November 7, 2008. *Id*. at 44:17-45:2. While it is disputed whether Plaintiff

---

[1] The patient shall be referred to as "Patient X" or the "Patient" for privacy purposes.

received a full report regarding Patient X upon admission, DSOF ¶ 8; PSOF ¶ 10, it is clear that he did perform an assessment of Patient X's pain at that time. DSOF ¶ 8. Plaintiff indicated that Patient X was able to walk and did not appear to be in pain when he was admitted. [24-3] D. Ex. 2 at 48:18-21, 50:6-12.

On November 7, 2008, Plaintiff was responsible for the following specific duties: admissions, patient care charting, and caring for patients detailed to him. *Id*. at 460-462. He also had a general responsibility to continue caring for the patients that he admitted. *Id*. On 2 South, all nurses were able to dispense medication. *Id*. at 252. While there was a designated "medication nurse" who was specifically assigned to give medications as her primary duty, that did not negate the responsibility of RNs like the Plaintiff to administer medicine. *Id*.

Roginia Smith ("Smith") was a licensed practical nurse ("LPN") working in 2 South on the night of November 7, 2008. *Id*. at 316:21-317:5. At about 10:00 p.m., Patient X's wife ("Mrs. X") came to the nurse's station and requested pain medication for her husband. [24-10] D. Ex. 8. Smith told Mrs. X that her husband had to come to the nurse's station to get his medication because she had to scan his wrist barcode. *Id*. Mrs. X told Smith that her husband was in severe pain[2] and could not come to the nurse's station. *Id*. Smith reiterated that Patient X would have to come to the desk. *Id*. Plaintiff saw Mrs. X having a heated discussion with

---

[2] Plaintiff disputes Patient X's pain level but that fact is not material. Plaintiff seems to rely on the fact that Mrs. X told him she did not want to bring the Patient to the nurse's station because he was "comfortable" in bed. [30-4] P. Ex. 30 at 23-24. However, there is evidence suggesting that the Patient was in pain and was uncomfortable in bed. *See* D. Exs. 5, 9, 2 at 140-141. The body of the evidence, even when read in Plaintiff's favor, suggests that Mrs. X meant her husband was comfortably arranged in bed, and moving him would cause him additional pain. Mrs. X confirmed that understanding, saying that getting the Patient out of bed would "cause him more pain," suggesting he was already in pain. [30-4] P. Ex. 30 at 24. Patient X's pain level is ultimately not dispositive however, because the Court's decision is based on the lack of "substantial similarity" and "pretext" as explained below.

LPN Smith and went to see if he could be of assistance. [24-3] D. Ex. 2 at 60:2-10. He heard LPN Smith tell Mrs. X that the patient "needed to come to the nurse's station" to get his medication, and he admits that he "reinforced that" to the wife. *Id*. at 68. Plaintiff testified that he told Mrs. X "the same thing that the LPN is telling you that [the patient] needs to come to the nurse's station to receive medications." *Id*. at 70:11-16. Despite having admitted to the above, Plaintiff insists that Mrs. X made "no request for pain meds." *Id*. at 82:1-3.

At no time during or shortly after this argument did Plaintiff help Patient X. Plaintiff did not assess Patient X for pain and Plaintiff did not see anyone else do so. *Id*. at 149. There is no evidence in the record he ensured that someone else assessed the Patient's pain, or that he took any further action to ensure that the Patient was adequately cared for. In fact, the last time Plaintiff assessed Patient X for pain on November 7, 2008 was at 6:00 p.m, nearly four hours before the incident. *Id*. at 166:9-12.

After the heated argument with Mrs. X, Plaintiff walked away from the nurse's station and, as he did so, he saw Charge Nurse Malibiran ("Malibiran"). *Id*. at 71. According to the Plaintiff, Malibiran was standing by the door to the nurse's station, approximately ten to fifteen feet away, in a position where she could see and hear the argument. *Id*. Plaintiff walked over to Malibiran, shrugged his shoulders, and said, "how long is she [Mrs. X] going to be here." *Id*. at 74:11-20. Plaintiff then walked back towards the inside of the nurse's station and observed Malibiran "walk over towards the desk where the LPN [Smith] was at." *Id*. at 72:4-

20.  Plaintiff testified that Malibiran appeared to have a conversation with the LPN, though he did not hear what was said.  *Id.*

There is conflicting evidence in the record about whether Malibiran was aware of the incident and, if so, the extent of her awareness.  For her part, Malibiran did not remember witnessing the argument between Mrs. X and Plaintiff or LPN Smith.  *Id.* at 452:16-24, 456:18-457:6.  Malibiran testified that the first time she heard any complaint from Mrs. X was when Mrs. X left the floor at about 10:30 and asked her for the name of the nurse who had admitted Mr. X (Plaintiff). *Id.* at 465:12-466:3. LPN Smith testified, however, that she had a discussion with Malibiran after the incident and that Malibiran admitted she had heard Smith's conversation with Mrs. X. [30-2] P. Ex. 24 at 8-9.

Approximately thirty minutes after the incident, Plaintiff observed Patient X in a wheelchair at the nurse's station, along with his wife, getting his medications. [24-3] Ex. 2 at 73:5-24, 76:1-23.  Then he saw them leave the nurse's station and go back towards their room.  *Id.* Plaintiff had no other interactions with Patient X or his wife that night. *Id.*

### C. The Disciplinary Process

The disciplinary process that resulted from the incident began that very night, when Associate Chief Nurse Alexander was notified that an issue had arisen. *Id.* at 372:21-373:5.  The next day, the Chief of the Mental Health Service Line emailed Alexander, detailing the complaints from Mrs. X. [24-13] D. Ex. 11; [24-3] D. Ex. 2 at 236:14-15. The e-mail, titled "Information about high profile patient,"

informed Alexander that Patient X and his wife had multiple compelling complaints of "nursing staff insensitivity bordering on abuse." [24-13] D. Ex. 11. This included inappropriate yelling in the hallway by one of the nurses, frightening the Patient, being insensitive in communications to Mrs. X and the Patient, as well as inappropriately handling the Patient's pain medication by insisting he walk to the nurse's station. *Id*. Alexander also received "Report of Contact" memos from LPN Smith and another nurse describing the events of November 7. [24-10] D. Ex. 8; [24-11] D. Ex. 9.

On November 10, 2008, the Director of the Hines VA appointed an Administrative Investigation Board ("AIB") to conduct a review of the facts related to the allegations made by Patient X and his wife. [24-20] D. Ex. 18. The memorandum initiating the AIB referenced misconduct by Plaintiff and Smith, but did not say anything about Malibiran. *Id*. On November 13, 2008, Alexander issued Smith a reassignment memo that noted the complaints related to Patient X and temporarily detailed her out of patient care. [24-8] D. Ex. 6. On November 14, 2008, Alexander issued a similar memo to the Plaintiff. [24-7] D. Ex. 5. There is no evidence that a reassignment memo was sent to Malibiran. Both Plaintiff and Smith were given non-public-contact assignments until the AIB investigation concluded, roughly three months later. [24-9] D. Ex. 7 at RFA 8.

In January 2009, the AIB concluded its investigation and issued a report. [24-2] D. Ex. 1. The report found there was no evidence that Plaintiff and Smith had abused the Patient or breached therapeutic boundaries. The AIB did conclude,

however, that Plaintiff and Smith "did not respond immediately to the request from Mrs. [X] for pain medication to be brought to Mr. [X]'s room," and that while "the intent to abuse" Patient X was not substantiated, "poor judgment was used in not addressing this nursing request directly and immediately." *Id.* The AIB found no wrongdoing by Charge Nurse Malibiran. *Id.*

### i. Plaintiff's Termination

Plaintiff met with Alexander and Banks three times after the incident to discuss his conduct. DSOF ¶¶ 34-36. At the meetings, Plaintiff claimed that he "did nothing wrong" and that he "did nothing to jeopardize the patient's safety." [24-3] D. Ex. 2 at 157:13-20. Alexander responded by telling the Plaintiff that he had failed to address the patient's pain needs appropriately. *Id.* at 81:24-82:23, 159:4-7. Plaintiff was argumentative and accepted no responsibility during each meeting with Alexander. *Id.* at 394:12-17.

On March 19, 2009, Alexander wrote to Michelle Rummage in Human Resources requesting to terminate Plaintiff for "failure to provide safe and timely care to a patient." [24-14] D. Ex. 12; [24-3] Ex. 2 at 290:2-6. Alexander wrote that Plaintiff is:

> "an experienced Registered Nurse. However, while speaking with the employee, he admitted that he did fail to respond to a family member's request to have a patient receive pain medication. In addition, he did not assess the patient's level of pain. This is not an acceptable standard of care. It is also alarming that an experienced nurse would fail to utilize critical thinking skills. This resulted in the patient be[ing] placed in a potentially harmful situation. His failure to respond and act appropriately also created a negative impact on patient satisfaction. Patient satisfaction is a Performance Measure for the facility." [24-14] D. Ex. 12.

Rummage responded by requesting records and information relating to Plaintiff's training, and Alexander said that he would send what he had. *Id.*

At the time Plaintiff was disciplined, he was a temporary, excepted employee subject to a period of temporary status followed by a two-year probationary period. [24-3] D. Ex. 2 at 284:5-19, 342-343, 540:2-3. As such, he was subject to termination at will, with no right to appeal to the Merit Systems Protection Board ("MSPB") or other similar rights held by career employees. *Id.* On March 20, 2009, the VA issued a letter to Plaintiff terminating his excepted appointment due to "unacceptable performance." [24-15] D. Ex. 13.

### ii. LPN Smith's Termination

Similar to the Plaintiff, Alexander met with LPN Smith after the incident to discuss her poor performance and tell her how the care she provided to Patient X had been substandard. [24-3] D. Ex. 2 at 285:10-286:2. Unlike the Plaintiff, Smith did not respond by arguing with Alexander, but by expressing remorse, apologizing, and promising that it would not happen again. *Id.*

LPN Smith also differed from the Plaintiff in that she was a career employee who had procedural and substantive rights concerning disciplinary actions. *Id.* at 552. This included a full review by the MSPB of the substantive grounds for any discipline imposed on her. *Id.* at 539-40, 552:5-23; [30-1] P. Ex. 15. For career employees, then, it was the practice of the HR department to require more complete and compelling evidence to support any discipline. *Id.* at 543:9-24, 551:21-552:23. For excepted appointments like Plaintiff, HR only required management to

articulate a basis for the proposed discipline, but not to provide the same evidence or detail as required to proceed against a career employee. *Id*. at 543:20-24.

As with Plaintiff, Alexander wrote a memo to Michelle Rummage about LPN Smith's role in the incident. [24-16] D. Ex. 14. That memo was sent roughly one month after Plaintiff's memo[3] and detailed Smith's role in the events of November 7, 2008, including her failure to fulfill her duties as an LPN. *Id*. The memo requested that Rummage "provide guidance on the appropriate level of disciplinary action(s) for this employee, including a 14-day suspension and possible removal." *Id*. While Plaintiff notes that the memo was only sent to Rummage *after* Plaintiff contested his termination with the EEO Office of Resolution Management, there is no evidence that Alexander knew the Plaintiff had contacted that office.

Around this time, Rummage left the VA and was replaced by Estella Guerrero. [24-3] D. Ex. 2 at 531:18-21, 532:9-11. Guerrero had not been involved in the disciplinary action against Plaintiff. *Id*. at 531:18-21. On April 21, 2009, Guerrero emailed Alexander in response to his memo concerning Smith's performance on November 7, 2008. That email questioned the timeliness of the action against Smith and contained roughly seventeen questions Guerrero wanted answered before disciplining Smith. [24-17] D. Ex. 15.

Ultimately, Alexander did not have enough information to respond to those questions and build a sufficiently convincing case to fire Smith. Alexander testified

---

[3]Alexander testified that the reason for the delay between the operative events on November 7, 2008, and his written proposals of discipline for Plaintiff and Smith (in March and April 2009), was because of the three month AIB investigation, his other duties, a number of other disciplinary actions that he had on his desk, and the fact that he had to work with HR in order to commence disciplinary proceedings. [24-4] D. Ex. 2 at 408:22-409:4.

that he wanted to and requested to terminate Smith based on the November 7, 2008 incident, [24-16] D. Ex. 14; [24-3] D. Ex. 2 at 321:18-22, but he did not have the ability to fire an employee on his own. [24-3] D. Ex. 2 at 322:1-3. Guerrero testified similarly, stating that Alexander had wanted to pursue disciplinary action against Smith based on the November 7, 2008 incident, but because of her evaluation of "how much information we still needed and how old the case already was ... I went down the path of saying that it was just not going to be a good case, a solid case to pursue after being so old." *Id.* at 545:14-546:5. Alexander maintains, however, that the incident did play some part in the decision to discipline Smith, despite it not being explicitly listed on her proposed removal letter. *Id.* at 321:3-22; [30-2] P. Ex. 20 at 7; [30-2] P. Ex. 21 at 61; [24-18] D. Ex. 16.

Guerrero eventually concluded that, although Alexander had requested to proceed based on the November 7 incident, it was stronger to rely on more current issues for the formal charges against Smith. *Id.* at 546:16-22. Guerrero testified that her thinking was influenced by the fact that there were ongoing problems with LPN Smith: "[P]art of it was at that time Mr. Alexander had raised some other issues that were ongoing with Ms. Smith. And so from my perspective, it was a strong case for me to pick up more current issues involving Ms. Smith." *Id.*

In June 2009, roughly two months after Alexander's written request for disciplinary action against Smith, the VA issued Smith a notice of proposed removal. [24-18] D. Ex. 16. The notice was based on more recent grounds and did not cite the events of November 7, 2008. *Id.* After the necessary procedures were

followed, Smith was removed from her position pursuant to the June notice. [24-19] D. Ex. 17.

No disciplinary action was taken against Malibiran. The AIB found no wrongdoing on her part and Mrs. X made no complaints about her. [24-2] D. Ex. 1.

## II. Legal Standard

Summary judgment must be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 547 (7th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In reviewing a summary judgment motion, the court construes all facts, and draws all reasonable inferences from those facts, in favor of the non-moving party. *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir. 2014).

## III. Analysis

Defendant argues that summary judgment should be granted because Plaintiff has not propounded evidence sufficient to allow a reasonable jury to find that the Plaintiff was discriminated against based on age or sex. [23] D. MSJ at 11-12. In a discrimination case, the plaintiff may support his claims through either the

11

direct or the indirect method. *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1157 (7th Cir. 2014). This is true of claims for both age and sex discrimination. *Id.*; *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 876 (7th Cir. 2014). Plaintiff's claims fail under both methods.

## A. The Direct Method

The direct method "requires courts to inquire whether a rational juror could infer discriminatory intent from the direct and the circumstantial evidence in the record." *Zayas*, 740 F.3d at 1157. Proving discrimination through the direct method "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 832 (7th Cir. 2005) (quoting *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000)). Such admissions are rare, however, and a plaintiff may also "prevail under the direct method of proof by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decision-maker." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (internal quotations and citations omitted). That circumstantial evidence, however, "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

Defendant argues that Plaintiff does not have direct or circumstantial evidence sufficient to allow a reasonable jury to infer discrimination. [23] D. MSJ. at 12. The Court agrees. First, Plaintiff has produced no argument or evidence under the direct method that he was fired on the basis of his sex.

Second, though Plaintiff's brief does not argue for age discrimination under the direct method, he has pointed to evidence in support of his argument for pretext that merits consideration here. *See* [29] P. Resp. Br. at 20. Upon examining that evidence, the Court finds that the comments cited by the Plaintiff fall far short of forming a "convincing mosaic" that points directly to discrimination based on age.

Alexander's comments about Plaintiff's experience as a nurse are insufficient to show age based discrimination. In the section of his brief concerning pretext, the Plaintiff argues as follows:

> "In this regard, plaintiff testified Alexander 'Kept indicating that I had been a nurse for too long...,' (Pl. Exh. 19 at 15) and that he referred to [him] as 'a seasoned nurse and how long [I] had been working' as a nurse. (Pl. Exh. 7). Alexander also conceded he referred to plaintiff as a "seasoned" nurse with over 20 years of nursing experience. (Pl. Exh. 20 at 10)."

[29] P. Resp. Br. at 20. These comments, however, simply show that Plaintiff's performance was particularly deficient given his many years of experience. They relate to Plaintiff's expected ability to handle patient requests and think critically about what is required from him as an RN – they are not evidence that Plaintiff was fired because of his age. In describing Plaintiff's job performance, Alexander said:

> "[Plaintiff] did not assess the patient's level of pain. This is not an acceptable standard of care. It is also alarming that an experienced nurse would fail to utilize critical thinking skills. This resulted in the patient be[ing] placed in a potentially harmful situation." [24-14] D. Ex. 12.

> "Mr. O'Neal was, number one, a seasoned nurse with, if I remember correctly and I am using my mind, over 20 years of nursing experience. And if this is the level of care that he has provided, this is not the kind of employee we want here." [30-2] P. Ex. 20 at 10.

"Q. And you indicate that [Plaintiff] was a seasoned nurse and he should have known better. Is that pretty much the gist of why you held him to a higher standard? Is that what you called it? A. One of the reasons, yes. Q. And a person that has greater experience in the unit should be held and expected to toe the line, is that right, do better than others that don't have that experience? A. I would expect a person who is experienced to have a stronger skill set and knowledge base, yes." [24-3] D. Ex. 2 at 427:8-19.

Plaintiff himself helped confirm the meaning of Alexander's comments when he explained that Alexander had said, "you're a seasoned nurse and this is what you're supposed to do," in reference to the quality of care that was expected. *Id*. at 82:1-6.

The court in *Millane v. Becton Dickinson & Co.* addressed a similar issue. 84 F. Supp. 2d 282, 287 (D. Conn. 1999). There, the plaintiff claimed that a remark that the company did not like "seasoned employees" working in his region was evidence of age discrimination. The court disagreed. It explained that "[o]ne may be a 'seasoned employee' without even being in the protected class of a person over the age of forty. With enough longevity and experience, one may be a 'seasoned employee' at any age, including an individual under the age of forty." *Id*. at 287. This almost directly mirrors Alexander's explanation of his own use of the term "seasoned." He said that "[s]easoned nurse means years of practice. You can go to nursing school straight out of high school at 17. At 20 years later I would consider you a seasoned nurse. You can go to nursing school as a second or third career and go at age 40, and 20 years later you're 60. It's the level of experience." [24-4] D. Ex. 2 at 413:14-21.

As in *Millane*, the comments made by Alexander in this matter are not evidence of age discrimination. The comments do not point "directly to a

discriminatory reason for the employer's [disciplinary] action," but rather show that Plaintiff was fired for failing to live up to the job expectations his employer had for someone of his experience. *Adams*, 324 F.3d at 939. Plaintiff's claims thus fail under the direct method.

## B. Indirect Method

To succeed under the indirect method, the Plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The Plaintiff may do so by showing that: (1) he is a member of a protected class; (2) he satisfied his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012).[4]

Once a *prima facie* case is established, a presumption of discrimination is triggered and the burden shifts to the Defendant "to introduce a legitimate, nondiscriminatory reason for the employment action." *Naficy v. Illinois Dep't of Human Servs.*, 697 F.3d 504, 511 (7th Cir. 2012). If the Defendant does so, the "burden shifts back to the Plaintiff to provide evidence that the employer's stated reason was pretextual." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013). At all times, Plaintiff retains the ultimate burden of persuading this Court that Defendant unlawfully discriminated against him. *St. Mary's Conor Center v. Hicks*, 509 U.S. 502, 511 (1993).

---

[4] This same four-part test governs cases of sex discrimination under Title VII, *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 879 (7th Cir. 2014), and age discrimination under the ADEA. *Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 517 F.3d 470, 475 (7th Cir. 2008).

Here, the parties do not dispute that the Plaintiff was a member of a protected class and suffered an adverse employment action (prongs 1 and 3). The Court therefore will consider only: (1) whether Plaintiff satisfied the VA's legitimate job expectations; (2) whether Plaintiff and Smith or Malibiran were similarly situated employees; and (3) whether the VA's stated reasons for terminating the Plaintiff were pretextual.

### i. Legitimate Expectations

Defendant argues that Plaintiff cannot prevail under the indirect method because he failed to meet "his employer's legitimate expectations." [23] D. MSJ at 12. Normally, if an employee fails to satisfy his employer's legitimate job expectations he cannot succeed on a claim of discrimination under the indirect method. *Coleman*, 667 F.3d at 845. However, when the plaintiff alleges that the employer applied its "legitimate job expectations" in a disparate manner, the legitimate expectations prong is not dispositive. *Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 830-31 (7th Cir. 2007).

Consider, for instance, if two similarly situated employees both fail to satisfy their employer's expectations through similar failings, but the plaintiff is disciplined and the other employee is not, and there are allegations of a discriminatory motive in that disciplinary decision. Under those circumstances, the fact that the plaintiff failed to live up to his employer's job expectations is not dispositive. *Curry v. Menard*, 270 F.3d 473, 477-78 (7th Cir. 2001) ("where the issue is whether the plaintiff was singled out for discipline based on a prohibited factor, it

makes little sense … to discuss whether she was meeting her employer's reasonable expectations") (internal quotations omitted). In such cases, the "legitimate expectations" analysis is merged into the "similarly situated" analysis and the Court must only decide whether the employees at issue were similarly situated.

Plaintiff contends that, if he failed to meet the VA's job expectations then so too did Smith, yet Smith was not punished. The reason there was no punishment, Plaintiff claims, is because Defendant discriminated against him. As such, the Plaintiff need not provide evidence that he met the VA's legitimate job expectations in order to show a *prima facie* case of discrimination. *Id.* That prong does not factor into the Court's analysis.

### ii. Similarly Situated

To establish a *prima facie* case of sex or age discrimination under the indirect method, the Plaintiff must also show that "another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff." *Burks v. Wisc. Dept. of Trans.*, 464 F.3d 744, 750-51 (7th Cir. 2006). The similarly-situated analysis calls for a "flexible, common-sense" examination of all relevant factors. *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007). Its purpose is to eliminate other possible explanatory variables for the difference in discipline, "such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable" – discriminatory animus. *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) *aff'd*, 553 U.S. 442 (2008). Similarly situated employees "must be 'directly comparable' to the plaintiff 'in all

material respects,'" but they need not be identical in every conceivable way. *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 365-66 (7th Cir. 2009) (quoting *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610-11 (7th Cir. 2006)).  The Plaintiff has claimed that both LPN Smith and Charge Nurse Malibiran were similarly situated employees who were treated more favorably than he was.

### 1. LPN Smith

The Court finds that Plaintiff and LPN Smith are not similarly situated because: (1) Plaintiff was a temporary/probationary employee while Smith was a career employee with significant employment protection; and (2) the Plaintiff and Smith had drastically different responses to the criticism of their job performance.

Probationary employees and non-probationary employees are not similarly situated for purposes of the indirect method of proving discrimination.  *Steinhauer v. DeGolier*, 359 F.3d 481, 485 (7th Cir. 2004) (finding that two employees "were not similarly situated because [one] was still on probation while [the other] was not"); *Gage v. Metro. Water Reclamation Dist. of Greater Chicago*, No. 02 C 9369, 2004 WL 1899902, at *9 (N.D. Ill. Aug. 18, 2004) (same).

The Court in *Marshall* v. *Winpak Heat Seal Corp.* explained the rationale behind this distinction.  No. 08-CV-1170, 2010 WL 1433374, at *5 (C.D. Ill. Apr. 8, 2010).  In *Marshall*, the defendant/employer moved for summary judgment on a Title VII race discrimination claim arguing, in part, that the proposed comparator employee was not similarly situated to the plaintiff.  *Id.* at *1.  The comparator chosen by the plaintiff was a non-probationary employee while the plaintiff was a

probationary employee who could be terminated without cause. *Id*. at *1, 5. The court found that the two employees were not similarly situated because the proposed comparator employee was a non-probationary employee who "was entitled to the protections of progressive discipline and for cause termination." *Id* at *5. The plaintiff, on the other hand, was "not entitled to progressive discipline and could be terminated without cause, as she was still on probation." *Id*. The court therefore granted the defendant's motion for summary judgment.

The same reasoning applies here. Plaintiff was a temporary, excepted employee of the VA. He had not even begun his probationary period when he was fired. DSOF ¶ 46. As such, he was subject to termination at will, with no right of appeal to the MSPB. DSOF ¶ 45; [24-4] D. Ex. 2 at 539-40. According to the VA Handbook, "in effecting involuntary separations of" RN's like the Plaintiff, "the procedural requirements prescribed for separations, such as review by Professional Standards Boards or Disciplinary Board, do not apply." [30-1] P. Ex. 3. Additionally, RN's like the Plaintiff were not "entitled to a review of the involuntary separation." *Id*. In contrast, LPN Smith was a career employee with both procedural and substantive employment rights. This included a full review by the MSPB of the substantive grounds for any disciplinary action taken against her. DSOF at ¶ 47. Given their different employment statuses, Plaintiff and LPN Smith are not similarly situated for purposes of the indirect method analysis.[5]

_____

[5] Plaintiff claims that, despite the difference in employment rights between temporary and career employees, he was similarly situated to Smith because he was entitled to contest his termination under the EEO complaint resolution procedures. This argument is without merit. All employees can avail themselves of the EEO procedures, this does not change the fact that Plaintiff was an at will employee with significantly less employment protection than Smith.

The disciplinary proceedings that resulted from the incident confirm Plaintiff and Smith were not "similarly situated," as their different employment statuses directly influenced their differing outcomes. On March 19, 2009, Alexander requested Plaintiff's termination in a one paragraph email to HR that briefly described Plaintiff's conduct. [24-14] D. Ex. 12. Within the next hour and a half the following happened via email: (1) HR requested a copy of the Plaintiff's training record; (2) Alexander said he would provide what he could in that regard; and (3) HR agreed with the suggestion that Plaintiff be terminated. *Id*. Plaintiff was issued a termination letter the very next day. [24-15] D. Ex. 13.

Regarding LPN Smith, Alexander wrote a memo to HR on April 14, 2009 asking for guidance on potential punishment for Smith's role in the incident. [24-16] D. Ex. 14. This included a proposed suspension or removal. *Id*. HR responded via email with seventeen questions they wanted answered before they could proceed with disciplinary action against Smith. [24-17] D. Ex. 15. Both Alexander and Estella Guerrero testified that Alexander wanted to discipline Smith for her actions on November 7, 2008. [24-3] D. Ex. 2. at 321-322, 545-546. However, Guerrero explained that they did not have evidence sufficient to build a good case for Smith's termination because HR required more evidence to support discipline against career employees. *Id*. at 543:9-19, 545:14-546:5, 551:21-24, 552:5-23. Because Alexander and HR could not gather sufficient evidence regarding the incident, they based Smith's formal termination on a more recent issue for which they had a stronger case. *Id*. at 545-546. Alexander explained, however, that the November 7 incident

did play some part in the decision to eventually terminate Smith. *Id.* at 321:3-22; [30-2] P. Ex. 20 at 7; [30-2] P. Ex. 21 at 61.

Plaintiff's argument against the probationary/non-probationary distinction is unavailing. Plaintiff contends that probationary and at-will employees do not lose their right to non-discrimination in the work force. [29] P. Resp. Br. at 10-11. While absolutely true, this argument is a red herring. At issue is not whether probationary employees are entitled to protection from discrimination, but whether Plaintiff and Smith, as probationary and non-probationary employees, are similarly situated for the purposes of the indirect method of analyzing claims of discrimination. They are not.

Plaintiff cites to cases from other jurisdictions that have held probationary and non-probationary employees *were* similarly situated. [29] P. Resp. at 10-11. Those citations are unpersuasive for two reasons. First, binding case law in the Seventh Circuit has held the exact opposite. *Steinhauer*, 359 F.3d at 485; *Gage*, 2004 WL 1899902, at *9. Second, this Court is not basing its decision solely on the fact that Plaintiff was *labeled* a temporary excepted employee (probationary) and Smith was *labeled* a career employee (non-probationary). The Court's decision is based, in part, upon the fact that the difference in employment status is what led to the differing outcomes.

The Court further finds that Plaintiff and Smith were not similarly situated in a second respect: their opposite responses to Alexander's criticism of their job performance. The purpose of the "similarly situated" analysis is to remove from

consideration variables that could possibly explain the difference in treatment, thereby exposing the discriminatory motive. *Humphries*, 474 F.3d at 405. Here, one reason that Plaintiff was fired and LPN Smith was not is that, in reacting to Alexander's critique of their performance, Plaintiff argued and refused to accept responsibility while Smith apologized and promised to do better. [30-2] P. Ex. 20 at 13:5-14; [24-3] D. Ex. 2 at 157-160, 270:3-7, 285-286, 303-304, 390-384.

While the Seventh Circuit has not directly addressed the issue, courts in other Circuits repeatedly have held that employees are not similarly situated when they react differently to performance criticism. *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1233 (10th Cir. 2000) (finding employees were not similarly situated where one "made conciliatory gestures" and the other did not); *Riley v. Emory University*, 136 F. App'x 264, 267 (11th Cir. 2005) (holding that an employee who apologized for her misconduct and one who did not were not similarly situated); *United Food & Commercial Workers Int'l Union Local No. 1142 v. John Morrell & Co.*, No. C95-4024, 1996 WL 33423404, at *3 (N.D. Iowa Aug. 12, 1996) (finding that two employees were not "similarly situated" where the "employee alleged to have been similarly situated apologized to the company and the customer right away, [and] accepted full responsibility for his actions" while the plaintiff did not); *Harris v. Winter*, No. CIV.S-02-2436, 2007 WL 2900168, at *15 (E.D. Cal. Sept. 28, 2007) *aff'd sub nom. Harris v. Penn*, 323 F. App'x 619 (9th Cir. 2009) ("It is reasonable that a supervisor confronted with two employees, both of whom the supervisor concludes have committed the same misconduct, one of whom admits the

error and apologizes, with the other refusing to accept any blame, may decide that the second employee requires more discipline to correct the problem").

The Court finds this reasoning persuasive. An employee who apologizes, accepts responsibility for her failings, and expresses a desire to improve is likely to be treated much less harshly that an indignant employee who digs in his heels and refuses to accept responsibility. That is the difference between Smith and the Plaintiff, and it is one of at least two reasons that they are not similarly situated.[6]

### 2. Charge Nurse Malibiran

Defendant argues that the Plaintiff and Malibiran were not similarly situated because: (1) Malibiran was not as involved in the incident at the heart of this matter, and (2) as with Smith, Malibiran was a career employee with substantial employment protections. The Court agrees.

First, the undisputed record shows that Malibiran was not involved in the heated exchange with Mrs. X regarding her husband's medication. Malibiran did not tell Mrs. X that her husband had to come to the nurse's station to get his medication. Mrs. X did not file any complaints about Malibiran. And the AIB investigation did not find that Malibiran acted improperly. [24-2] D. Ex. 1. She therefore differs from the Plaintiff in that there was no real impetus to discipline her. Both Plaintiff and Smith had complaints filed about them by Mrs. X, and the AIB found that both of their conduct was substandard. As neither of those

---

[6] The Court further notes that Plaintiff argued and refused to apologize not because he thought he was being discriminated against, but rather he did so because he felt he had done nothing wrong. [24-3] D. Ex. 2 at 81:23-82:6, 157:13-20.

happened to Malibiran, and Malibiran was not directly involved in the incident, she is not similarly situated to the Plaintiff.

Second, as with Smith, Malibiran is different from the Plaintiff in that she was a career employee. As explained above, career employees are entitled to significant employment protection that Plaintiff, as a temporary excepted employee, was not entitled to. For the reasons set out in the section concerning LPN Smith, the Plaintiff and Malibiran are not similarly situated due to this difference in employment status.

### iii. Pretext

Even if Plaintiff could show a *prima facie* case of age or sex discrimination, the undisputed facts show that the Defendant's "legitimate, nondiscriminatory reason for the employment action" was not pretextual. *Naficy*, 697 F.3d at 511-512. "A pretext for discrimination means more than an unusual act; it means something worse than a business error; pretext means deceit used to cover one's tracks." *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 730 (7th Cir. 2001) (internal quotations omitted). A plaintiff demonstrates "pretext by showing the employer's proffered nondiscriminatory reason is a lie and the real reason is based on discriminatory intent." *Hobbs v. City of Chicago*, 573 F.3d 454, 462 (7th Cir. 2009).

As a preliminary matter, the Court must note that the disciplinary action taken against Plaintiff was based on the fact he was aware there was a request or need for medication, and he failed to respond properly. Plaintiff claims, however, that Mrs. X made "no request for pain meds." [24-3] D. Ex. 2 at 82:1-3. The Court

finds this claim inconsistent with the rest of the record in this case, especially Plaintiff's own testimony that he told Mrs. X that the Patient "needs to come to the nurse's station to receive medications." *Id.* at 70:13-16; [24-2] D. Ex. 1 at 355; [24-11] D. Ex. 9; [24-12] D. Ex. 10; [24-13] D. Ex. 11; [24-20] D. Ex. 18. It is unbelievable that Plaintiff could have made that statement about the need to come to the nurse's station to receive medication without understanding that there was some need or request for medication. This is especially true when the two other individuals present (LPN Smith and Mrs. X) have said that there was a request for medication. [24-10] D. Ex. 8; [24-11] D. Ex. 9. In fact, this entire dispute came about *because* of that request for medication. Plaintiff's "inconsistent testimony" is therefore not sufficient to create a genuine issue of material fact because "the record as a whole points in one direction and the dispute is not 'genuine.'" *Outlaw v. Newkirk*, 259 F.3d 833, 841 (7th Cir. 2001).

Given the above, and the rest of the undisputed facts in the record, the Court finds that Defendant's reasons for firing the Plaintiff were not pretext for discrimination. Plaintiff was fired because he "failed to provide safe and timely care to a patient," "did not assess the patient's level of pain," "fail[ed] to utilize critical thinking skills," "created a negative impact on patient satisfaction," and failed to accept responsibility for his failings. [24-14] D. Ex. 12; [24-3] D. Ex. 2 at 270:3-7. There is no evidence in the record that these reasons are lies intended to cover up a discriminatory motive. This is exemplified by the fact that: (1) both Plaintiff and Smith were detailed off of 2 South following the incident, DSOF ¶ 33, and (2)

Alexander sought to discipline both Plaintiff and Smith for their actions on November 7, 2008. [24-14] D. Ex. 12; [24-16] D. Ex. 14. In fact, Alexander sought to discipline Smith for many of the exact same reasons that Plaintiff was fired. [24-16] D. Ex. 14.

Plaintiff's arguments purporting to show pretext fail, as none is sufficient to allow a reasonable jury to find that Defendant's "proffered non-discriminatory reason is a lie." *Hobbs*, 573 F. 3d 462. Plaintiff specifically presents thirteen arguments in favor of pretext, each of which will be addressed in turn.

First, Plaintiff argues that the Defendant's reasons for terminating Smith were pretextual because Plaintiff "was initially charged with 'patient abuse,'" but this allegation was "rejected by the AIB" and he was later terminated for "unacceptable performance." [29] P. Resp. Br. at 15. That is incorrect. The VA never changed its reasons for Plaintiff's termination. The AIB, which is not an employee disciplinary body, investigated Plaintiff for patient abuse based on the complaints by Mrs. X. It found no patient abuse, but did find that both Smith and the Plaintiff used "poor judgment . . . in not addressing [Mrs. X's] nursing request directly and immediately." [24-2] D. Ex. 1 at 357. Based on those results, and other information, the Defendant decided to terminate Plaintiff for "unacceptable performance," which was consistent with the AIB's findings.

Second, Plaintiff argues that he was not assigned to care for Patient X on the day of the incident and thus should not have been fired for any deficiency in care. Nowhere in the record is it suggested that Plaintiff was terminated because he

failed to care for a patient to which he was assigned. Plaintiff was terminated for failing to properly respond to the incident at the nurse's station when he became aware that Patient X had requested medication. In those circumstances, he should have gone to assess the patient or ensured that someone else did. Because he did not, the Plaintiff was terminated.

Third, Plaintiff argues that "Alexander admitted that he could not recall a single example of inappropriate conduct or any rude remarks made by plaintiff during his brief interactions with LPN Smith and the patient's wife on November 7, 2008." [29] P. Resp. Br. at 15. This argument also misses the point, as Plaintiff was not fired for making "rude remarks" or engaging in "inappropriate conduct."

Fourth, Plaintiff argues that the AIB found no evidence that Plaintiff abused or breached therapeutic boundaries towards Patient X or his wife. As with the first argument above, this argument is unavailing. Plaintiff was not fired because he abused or breached therapeutic boundaries, but because – as the AIB found – he provided inadequate care to Patient X.

Fifth, Plaintiff argues that LPN Smith was the only "medication nurse" on 2 South at the time of the incident. While true, the rest of the nurses still had a responsibility to provide care for patients and dispense medication as required. [24-3] D. Ex. 2 at 252:11-23, 296:22-297:5; [30-2] P. Ex. 21 at 22:10-24:3. Further, Smith was not fired soley for failing to dispense pain medication, but for his failure to assess the Patient's pain and provide other needed care to a patient who had requested medication.

Sixth, Plaintiff points to the fact that Theodora Banks, his immediate supervisor, did not agree with the Plaintiff's termination. However, it is not this Court's role to sit as a "super-personnel department" that scrutinizes "employer's business decision[s]." *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001). Indeed, to show pretext requires more than showing poor judgment in employment matters, it requires the showing of "a phony reason for [the disciplinary] action." *Martino v. W. & S. Fin. Grp.*, 715 F.3d 195, 202 (7th Cir.) *cert. denied*, 134 S. Ct. 296 (2013). The fact that one employee (Banks) disagreed with the Defendant's judgment does not show that Defendant's reason was "phony." Additionally, the evidence suggests that Banks did not disagree with the termination based on substance, but rather because she was "emotionally moved" by the idea of firing someone and preferred to avoid "the painfulness of seeing an employee or person lose their job." [24-4] D. Ex. 2 at 497:19-498:3.

Seventh, Plaintiff argues that LPN Smith engaged in "patient dispute violations before, during, and after the incident which occurred on November 7, 2008." [29] P. Resp. Br. at 15. This does not show pretext, as the undisputed facts show that Alexander *also* wanted to discipline Smith for her role in the incident. He could not do so because HR determined that he did not have enough evidence to terminate her as a career employee. As explained above, it is not this Court's role to sit as a super personnel department and analyze an employer's business judgment in how it weighs various factors in making disciplinary decisions. So long as the stated reason for discipline is not phony, it passes muster. Here, the fact that LPN

Smith was previously disciplined, then Alexander wanted to discipline her for the incident but could not, and then she was fired for other reasons, does not lead to the conclusion that the VA lied regarding why it fired the Plaintiff.

Eighth, Plaintiff claims that it is uncontested that Malibiran was present at the time of the incident and "handled" the pain medication dispute. [29] P. Resp. Br. at 15-16. However, the record does not clearly show this actually happened. The record suggests that, at the most, Malibiran was nearby when the dispute occurred but did not take part in the actual discussion. Nonetheless, the fact that the Malibiran may have been present during the altercation does not free Plaintiff from responsibility for his own poor performance. He was present at the nurse's station, was a part of the argument with Mrs. X, became aware that there was a request for medication, and failed to respond in any way. Mrs. X complained about Plaintiff's conduct and the AIB confirmed that his performance was substandard. None of this is true for Malibiran, which is why she was not punished.

Ninth, Plaintiff points out that the VA failed "to advise staff that the patient held deep seated racial animosity" which greatly contributed to the incident. [29] P. Resp. Br. at 16. This argument is irrelevant to the question at hand.

Tenth, Plaintiff argues that a reasonable jury could reject Defendant's contention that Plaintiff was in a supervisory role over LPN Smith because Malibiran testified that she was "in charge" of the unit at the time of the incident. *Id.* Since the Court's decision is not based on whether or not Plaintiff was serving in a supervisory capacity, this argument is immaterial.

Eleventh, Plaintiff claims that the Defendant's argument that it intended to punish Smith is specious and unfounded because Smith was returned to duty following the AIB without any discipline, and the investigation of Smith only began after the Plaintiff's complaint to the ORM. [29] P. Resp. at 16. This argument fails for two reasons. First, Plaintiff's claim that Smith was returned to duty following the AIB without discipline is not supported by any citation to the record. Second, the fact that Plaintiff contacted the ORM and then Alexander sought to discipline Smith is irrelevant here – as there is no evidence in the record that Alexander knew Smith had contacted the ORM. As previously noted in this Opinion, Alexander commenced incident related disciplinary proceedings against Smith on April 14, 2009 by proposing either removal or suspension. He testified that he wanted to discipline Smith for her role in the incident, and that the incident eventually was "part" of her termination. [30-2] P. Ex. 20 at 7; [30-2] P. Ex. 21 at 61. Plaintiff's eleventh argument for pretext is therefore unavailing.

Twelfth, Plaintiff claims that Alexander lied under oath on several occasions for the express purpose of defeating Plaintiff's claim. [29] P. Resp. at 17. This argument fails because the few mistakes Alexander may have made do not show that he lied about the reasons for terminating Plaintiff in order to cover up his discriminatory motives.

Plaintiff claims that Alexander misrepresented that Patient X was "complaining of pain" in his March 19, 2009 memorandum. [30-1] P. Ex. 7. Plaintiff seeks to show that Alexander lied in that memo by pointing to evidence from the

Plaintiff and Mrs. X that the Plaintiff was "comfortable" in bed, such that Mrs. X did not want to move him. However, there is other evidence suggesting that the Plaintiff was in pain and was uncomfortable in his bed. *See* [24-7] D. Ex. 5; [24-11] D. Ex. 9; [24-3] D. Ex. 2 at 140-141. Thus, ostensibly Mrs. X meant her husband was *relatively* comfortable in bed (*i.e.*, seated in a way that was most comfortable at the time), and moving him would only cause him additional pain. Mrs. X confirmed that understanding when she said that getting the Patient out of bed would "cause him more pain." [30-4] P. Ex. 30 at 24. In any event, Alexander's statement that Patient X was complaining of pain hardly rises to the level of a lie, let alone one intended to conceal discriminatory intent in his decision to fire Plaintiff.

Plaintiff claims that Alexander falsely testified "that he had spoken to patient X concerning his treatment on 2 South when he had not." [29] P. Resp. at 17. At his January 28, 2010 deposition, Alexander testified that he had spoken to the wife but not the Plaintiff. [30-2] P. Ex. 21 at 16. At the EEOC hearing on September 24, 2012, more than two years after his deposition, Alexander testified: "if I remember correctly . . . I talked to the patient and his wife." [24-3] D. Ex. 2 at 236:15-17. This sort of inconsistency is not evidence of a purposeful lie, but a routine mistake of memory. Even if Alexander's inconsistency were considered a lie, which it does not appear to be, it does not by any means show that he lied about the reason the Plaintiff was fired.

Plaintiff argues that Alexander falsely told the EEO investigator that disciplinary action had been implemented against Smith as a result of her conduct

on November 7, 2008. [30-2] P. Ex. 20 at 7; [30-2] P. Ex. 21 at 61. Alexander testified, however, that Smith's conduct involving the patient on November 7th was "part" of Smith's termination, [30-2] P. Ex. 21 at 61, and that she was removed "for an accumulation of things." [30-2] P. Ex. 20 at 8. In light of the factual scenario described above, this can hardly be considered a lie. The undisputed evidence shows that Alexander attempted to discipline Smith for her part in the incident, he did not have enough information for that incident to be used in the formal charges, and instead HR chose to formally rely on a different incident – though Alexander maintains that the November 7th incident was part of Smith's eventual termination. [30-2] P. Ex. 21 at 61.

Finally, Plaintiff states that Defendant's contention that Plaintiff was subject to more onerous disciplinary action because he was acting as Smith's supervisor is conclusory and unsupported by the record. Nevertheless, because this Court's decision is not based on whether or not Plaintiff held a supervisory role, this argument is immaterial.

The undisputed evidence in this matter shows that Plaintiff was terminated for "unacceptable performance." He became aware that a patient had requested pain medication, yet failed to assess that individual for pain, ensure someone else assessed him for pain, or provide any other follow up care. For this the AIB found he had used poor judgment in responding to the Patient's needs, and for this he was terminated. None of the arguments presented by the Plaintiff would allow a reasonable jury to find that Defendant's reasons for firing him were lies intended to

cover up a discriminatory motive. Plaintiff's pretext argument is therefore unavailing.

## IV. Conclusion

The Court finds that the Defendant is entitled to summary judgment on Plaintiff's discrimination claims under both the direct and the indirect methods. Regarding the direct method, the Plaintiff does not have sufficient evidence pointing directly to discrimination to allow a reasonable jury to find in his favor. The Plaintiff likewise cannot prevail under the indirect method because: (1) he is not "similarly situated" to his proposed comparators, and (2) the Defendant's reasons for terminating the Plaintiff were not pretextual. In light of the foregoing, Defendant's Motion for Summary Judgment [22] is granted.


IT IS SO ORDERED

Dated: March 24, 2015

_____
Judge John Robert Blakey
United States District Court